**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM WENTWORTH FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:12-CV-116-JAR |
| | ) | |
| GEORGE LOMBARDI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. No.

38) On July 24, 2013, Plaintiff submitted a response in opposition to Defendants' Motion for

Summary Judgment with 100 pages of supporting exhibits. (Doc. No. 55) Defendants filed their

reply on August 5, 2013. (Doc. Nos. 57, 58) Plaintiff filed a surreply on August 30, 2013. (Doc. No.

61) The motion is therefore fully briefed and ready for disposition. For the following reasons, the

motion will be granted.

**I**. **Background**

On July 5, 2012, Plaintiff William Foster, a Missouri inmate at Southeast Correctional Center

(SECC), filed this action under 42 U.S.C. § 1983, seeking damages against Defendants George

Lombardi, Director of the Missouri Department of Corrections, Bill Stange, SECC Assistant Warden

at SECC, Corizon Medical Services, Inc., Drs. Michael Hakala, Cleveland Rayford, and Glenn

Babich, registered nurse Robin Fincher, and Missouri Delta Medical Center, for deliberate

indifference to his serious medical needs in violation of the Eighth Amendment to the United States

Constitution. (Doc. No. 1) Plaintiff alleged a lack of treatment for chronic kidney disease. The Court

ordered Plaintiff to file an amended complaint setting forth, as to each named defendant, the specific

factual allegations supporting each of his claims. (Doc. No. 5)

On September 4, 2012, Foster filed an amended complaint against the above named defendants claiming they violated his constitutional rights by permitting his kidney functions to deteriorate, hiding from him a diagnosis of chronic kidney disease, refusing to refer him to a nephrologist, denying him hernia surgery, and refusing to order him a colonoscopy. (Doc. No. 7) The Court dismissed defendants Lombardi, Stange, Babich, Rayford, and Missouri Delta Medical Center, leaving Dr. Hakala, nurse Fincher and Corizon, Inc. in the case. (Doc. No. 13)

Plaintiff filed a supplemental complaint on March 5, 2013, alleging Dr. Hakala discontinued his prescriptions for Lovastatin and Omega-3 fatty acids in retaliation for filing the instant action. (Doc. No. 30)

Defendants contend they are entitled to summary judgment because Plaintiff is unable to present sufficient facts or evidence to establish they acted either with deliberate indifference towards his serious medical needs or in retaliation for filing this action.

## II. Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate in a particular case, the Court must view the facts in the light most favorable to the

nonmoving party, and all justifiable inferences are to be drawn in his favor. Benford v. Correctional Medical Services, 2012 WL 3871948, at *4 (E.D.Mo. Sept. 6, 2012) (citing Celotex Corp., 477 U.S. at 331). The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id.(citing Anderson, 477 U.S. at 249). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Id. (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011)).          As a threshold matter, Defendants contend Plaintiff has failed to comply with the requirements of Fed.R.Civ.P. 56 and Local Rule 7-4.01(E).[1] (Reply, Doc. No. 58, pp. 1-2) Specifically, Plaintiff failed to file a response to Defendants' Statement of Uncontroverted Material Facts and to set forth citations to the record to support the additional facts he believes are in dispute. Plaintiff's pro se status does not excuse him from responding to Defendants' motion "with specific factual support for his claims to avoid summary judgment," Beck v. Skon, 253 F.3d 330, 333 (8th Cir. 2001), or from complying with local rules, see Schooley v. Kennedy, 712 F.2d 372, 373 (8th Cir. 1983). See also Carman v. Treat, 7 F.3d 1379, 1381 (8th Cir.1993) (failing to allow pro se

----

[1] Local Rule 4.01(E) provides with respect to summary judgment motions:

A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

prisoner to disregard Federal Rules of Civil Procedure). As a result of his failure to respond to Defendants' statement of facts, Plaintiff is deemed to have admitted all facts in Defendants' statement of uncontroverted facts. Turner v. Shinseki, 2010 WL 2555114, at *2 (E.D.Mo. June 22, 2010) (citing Deichmann v. Boeing Co., 36 F.Supp.2d 1166, 1168 (E.D.Mo.1999), aff'd, 232 F.3d 907 (8th Cir.2000), cert. denied, 531 U.S. 877, 121 S.Ct. 184, 148 L.Ed.2d 127). However, Plaintiff's failure to respond properly to the motion for summary judgment does not mean that summary judgment should be automatically granted in favor of Defendants. Even if the facts as alleged by Defendants are not in dispute, those facts still must establish that they are entitled to judgment as a matter of law. Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc., 332 S.W.3d 184, 191 (Mo.Ct.App. 2010) (citations omitted). See also Vandergrift v. Emerson, 2012 WL 15021, at *1 (W.D. Mo. Jan. 4, 2012).

In addition, Plaintiff attaches a number of exhibits, including what appears to be articles or chapters from various publications on kidney disease (Doc. No. 55-2, Exs. 2-7, 18, p. 90), copies of letters to and from Missouri state legislators (Doc. No. 55-2, Exs. 11, 15-17), and letters from the Chief Medical Officer of the Missouri State Board of Registration for the Healing Arts and St. Louis Connect Care (Doc. No. 55-2, Exs. 10, 14), which Defendants assert are inadmissible and not properly before this Court. Like any other civil litigant, Plaintiff is required to respond to Defendants' motion with specific factual support for his claims to avoid summary judgment. Nevertheless, to the extent that Plaintiff's submissions can be considered to controvert facts asserted by Defendants in their statement of uncontroverted facts, the facts are not material to the determination of Defendants' motion because, as further discussed herein, it is undisputed that Plaintiff received medical care and treatment. As such, the Court will consider Plaintiff's

submissions.

### III. Facts

**Kidney disease**

On January 26, 2005, Plaintiff met with Dr. Hakala for his annual physical examination. Dr. Hakala noted Plaintiff had a history of high cholesterol and ordered lab tests. (Defendants' Statement of Uncontroverted Material Facts (SOF), Doc. No. 40, ¶¶ 10-11)

Plaintiff had blood drawn for the lab tests on January 28, 2005. His test results showed an elevated lipids level. (SOF, ¶¶ 12-13) A second lab test was ordered to recheck Plaintiff's lipids 90 days later. Plaintiff's blood was drawn for a second lab test on May 10, 2005. (SOF, ¶¶ 13-14)

On September 19, 2005, Plaintiff met with Dr. Babich to review his lab test results. Plaintiff was noted to have elevated lipid levels and prescribed medication to control his cholesterol. Plaintiff was also placed in the chronic care clinic to monitor his cholesterol levels with regularly scheduled blood tests. (SOF, ¶ 15)

Plaintiff met with Dr. Babich on June 6, 2006 to review his lab test results. At that time Dr. Babich noted Plaintiff's glomerular filtration rate ("GFR")[2] was low and ordered a 24 hour urine collection for further evaluation of Plaintiff's kidney function. (SOF, ¶¶ 17, 19) Plaintiff began the 24 hour urine collection on July 12, 2006. (SOF, ¶ 20)

On August 1, 2006, Dr. Babich met with Plaintiff to review the results from the 24 hour urine collection and ordered a renal ultrasound (also known as a kidney ultrasound) and urine dip with instructions to follow-up with Plaintiff one month later. (SOF, ¶¶ 21-22) Plaintiff's GFR continued

---

[2] GFR estimates the amount of blood that passes through the filter in each kidney per minute and is one indication of kidney health. (Affidavit of Dr. Michael Hakala (Hakala Aff.), Doc. No. 40-2, ¶ 9)

to be measured and monitored approximately every six (6) months. (SOF, ¶ 23)

Plaintiff saw Nurse Robin Fincher at a chronic care clinic appointment on June 16, 2008. Fincher noted that she and Plaintiff "reviewed improving cholesterol levels and unchanged kidney function" and that she "encouraged Plaintiff to continue taking meds, exercising and monitoring diet. [Plaintiff] agreeable." (SOF, ¶ 24)

Following submission of a Medical Service Request ("MSR"), Plaintiff was assessed in nurse sick call by Nurse Susan Arvieux on November 28, 2011. Plaintiff requested a colonoscopy and inquired about Stage 3 Chronic Kidney Disease. Nurse Arvieux scheduled an appointment for Plaintiff to see Dr. Hakala on January 5, 2012 to discuss his concerns. (SOF, ¶¶ 25-26)

Plaintiff submitted MSRs on December 21 and December 22, 2011 requesting a colonoscopy and kidney ultrasound and was referred to the chronic care nurse for assessment. (SOF, ¶ 27)

Plaintiff failed to show at his January 5, 2012 appointment with Dr. Hakala. (SOF, ¶ 28)

In an MSR received on January 23, 2012, Plaintiff requested to be seen by a nephrologist. Plaintiff was assessed in nurse sick call on January 24, 2012. That same day, Plaintiff met with Dr. Rayford to discuss his colon and kidney concerns. Dr. Rayford reviewed Plaintiff's chart with him and showed Plaintiff where "he had been worked up in the past for CRI." Plaintiff stated that he did not understand that tests were done in 2006. Dr. Rayford explained Plaintiff's diagnosis of chronic renal insufficiency ("CRI") to him and that his CRI is stable. (SOF, ¶¶ 29-30)

On February 21, 2012, Plaintiff again met with Dr. Rayford to review recent lab results and discuss his CRI diagnosis. (SOF, ¶ 31)

On March 6, 2012, Dr. Hakala reviewed Plaintiff's lab work and noted in Plaintiff's chart that "[t]his offender has been incorrectly given the diagnosis of CKD III. He has not had chronic

kidney disease 3 and does not now. A review of his labs back to 2006 finds that he has had GFR at that time in July 2006 of 67.76. His GFR is reviewed in a corrected number in that his raw number must be multiplied by 1.21 to correct for body surface area in an African American. In 2008 it was 63.36, and 63.21; in 2009 62.92 and 68.97; in 2010 he has had 62.92 and 68.97. In 2011 he had 58.08 in May, the lowest GFR he has ever had. Since then in December 2011 his GFR was 62.92 and February 2012 he had a GFR of 60.5 . . . . To be diagnosed with CKD 3 he would have to have a GFR between 30-59 consistently for at least 3 months. He has not had that. At present he is best described as having chronic renal insufficiency and indeed that is stable. Dr. Rayford has placed him in a clinic to follow this." (SOF, ¶ 32) To further define Plaintiff's condition, Dr. Hakala requested a kidney ultrasound to check Plaintiff's kidney function, the results of which were normal and a 24 hour urine test. (SOF, ¶¶ 32-33) Dr. Hakala noted that "in my doing a [physical examination] in 2012 I listed CKD 3 as a diagnosis taking that from the face sheet. [Plaintiff] did not have his [sic] diagnosis in 2011 and does not now. Will correct the face sheet and my [physical examination] note from 2012." (Id.)

In March, 2012, Plaintiff refused a 24 hour urine test ordered by Dr. Hakala. (SOF, ¶ 32) Dr. Rayford met with Plaintiff on March 29, 2012 to discuss the importance of the 24 hour urine test, which was then rescheduled for April 8, 2012. (SOF, ¶ 35)

Plaintiff met with Dr. Rayford on May 1, 2012 to review the results from the kidney ultrasound and the April urine test, both of which were normal. Dr. Rayford informed Plaintiff that his CRI was mild and instructed him to follow-up with the chronic care clinic. (SOF, ¶¶ 35-36)

On May 15, 2012, Plaintiff reported to the TCU for a 24 hour urine collection. (SOF, ¶ 37)

On September 6, 2012, Plaintiff was seen in the chronic care clinic for his CRI. Dr. Hakala

noted that Plaintiff's CRI had improved and discussed with Plaintiff his diet and the effects of proteins and carbohydrates. (SOF, ¶ 38)

On April 16, 2013, Plaintiff was seen by Dr. Hakala for his complaint of "kidney disease." Plaintiff signed in for the appointment and then handed Dr. Hakala a typed form refusing medical treatment. Dr. Hakala's assessment of Plaintiff was "CRI" and noted that Plaintiff "[h]as signed a refusal. Needs to have another CMP, CBC C-Diff and 24 hour creatinine clearance done to follow his condition." (SOF, ¶ 40)

**Hernia**

On February 2, 2012, following Plaintiff's submission of an MSR to be seen for a hernia, Plaintiff was assessed during nurse sick call. (SOF, ¶¶ 46-47)

Dr. Hakala examined Plaintiff's hernia on April 6, 2012, and determined that surgery was not medically necessary because the hernia was not disabling or enlarged. Dr. Hakala issued a medical lay-in but stated he would not refer Plaintiff for surgery unless the hernia was incarcerated or enlarging and disabling. (SOF, ¶ 48) Dr. Hakala renewed Plaintiff's lay-in order in June and August 2012. (SOF, ¶ 49)

**Colonoscopy**

Plaintiff requested a colonoscopy[3] in June 2008. (SOF, ¶ 55) During Plaintiff's June 16, 2008 chronic care clinic appointment, Dr. Babich ordered a fecal occult blood test and requested that Plaintiff be scheduled for a digital rectal exam to check his colon health. (SOF, ¶ 56) Plaintiff refused the digital rectal exam and was issued containers to collect his stool samples for the fecal occult blood test on June 26, 2008. (SOF, ¶ 57) Plaintiff's fecal occult blood test was negative (i.e.,

---

[3] A colonoscopy provides an interior image of the large intestine and rectum and is more invasive than a digital rectal exam and a fecal occult blood test. (Hakala Aff., ¶ 25)

no blood was found in Plaintiff's stool). (SOF, ¶ 58)

Despite the normal fecal occult blood test, Plaintiff submitted an MSR on September 21, 2008 requesting a colon examination. (SOF, ¶ 59) Plaintiff was a no show at his nurse sick call appointment scheduled for September 23, 2008. (SOF, ¶ 60)

On September 17, 2009, Plaintiff submitted an MSR for a colonoscopy screening. He was assessed during nurse sick call on September 25, 2009. The nurse noted Plaintiff's annual physical was scheduled for January, 2010. (SOF, ¶ 61)

Plaintiff submitted MSRs for a colonoscopy, received on October 5, October 8, and October 12, respectively. Plaintiff was assessed during nurse sick call on October 12, 2009, and an appointment was scheduled for Plaintiff to see Dr. Hakala on November 19, 2009. (SOF, ¶ 62) At that appointment, Plaintiff complained of stool irregularities but refused a rectal exam. Despite Plaintiff's June 2008 negative fecal occult blood test and refusal of a digital rectal exam, Dr. Hakala requested a colonoscopy for Plaintiff. (SOF, ¶¶ 62-63) On December 14, 2009, Plaintiff received a colonoscopy, which revealed two (2) ¾ internal hemorrhoids but otherwise was normal. (SOF, ¶ 64)

Plaintiff refused digital rectal exams at his annual physical examinations in 2009-1013. (SOF, ¶ 65)

On December 23, 2011, Plaintiff requested a colonoscopy because he "had one 2 years ago and it's time to have another one." (SOF, ¶ 66)

Dr. Hakala ordered a fecal occult blood test on February 17, 2012 to screen Plaintiff's colon health. Plaintiff provided three (3) stool specimens and each specimen was negative for blood in the stool. (SOF, ¶¶ 67-68)

Plaintiff submitted an MSR, received March 19, 2012, again requesting a colonoscopy. On March 29, 2012, Plaintiff was assessed by Nurse Arvieux for his request for a colonoscopy and complaints of a hernia. Nurse Arvieux referred Plaintiff to see the doctor. (SOF, ¶¶ 69-70)

On April 6, 2012, Dr. Hakala determined that because Plaintiff had a normal colonoscopy in 2009 and three negative fecal occult blood tests in February 2012, a colonoscopy was not medically necessary. (SOF, ¶ 71)

**Retaliation**

Dr. Rayford renewed Plaintiff's prescription for Omega-3 fatty acids on July 13, 2012. (SOF, ¶ 73)

Dr. Hakala renewed Plaintiff's 90-day prescription for Lovastatin on September 29, 2012, and again on January 28, 2013. (SOF, ¶¶ 74-75) Dr. Hakala has not discontinued Plaintiff's prescription for either Lovastatin or Omega 3 fatty acids. (SOF, ¶¶ 76-77)

**IV. <u>Discussion</u>**

Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. <u>Toney v. Hakala</u>, 2013 WL 5406448, *18 (E.D. Mo. Sept. 25, 2013) (citing <u>Prosser v. Nagaldinne</u>, 2013 WL 210904, at *17 (E.D. Mo. Jan. 18, 2013)). <u>See</u> <u>also</u> <u>Nelson v. Corr. Med. Servs.</u>, 583 F.3d 522, 531–32 (8th Cir.2009) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)). To establish deliberate indifference, Plaintiff "must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." <u>Id</u>. The second part of the test requires Plaintiff to prove that the prison officials were more than negligent. <u>Id</u>. (citing <u>Alberson v. Norris</u>, 458 F.3d 762, 765 (8th Cir. 2006)). Plaintiff must show that the prison official's mental state was "akin to criminal recklessness." <u>Id</u>.

(quoting Gordon ex. rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir.2006)).

**Dr. Hakala**

Plaintiff alleges Dr. Hakala was deliberately indifferent to his medical needs by "secretly diagnosing" him with stage–3 chronic kidney disease ("CKD") several years ago, and then concealing the diagnosis from him. Plaintiff further alleges that, despite his serious medical need to be referred to a nephrologist, Dr. Hakala refused to make the referral, "because it is too expensive and Hakala chose to save money over protection of plaintiff's health." Plaintiff claims that as a result, he has suffered irreparable damage to his kidneys. (AC, ¶¶ 1-5, 17) Based on the medical records submitted, and drawing all inferences in Plaintiff's favor, the Court concludes that Dr. Hakala did not treat Plaintiff with deliberate indifference to his medical needs.

First, Plaintiff has presented no evidence that he was in fact diagnosed with CKD. He claims there is conflicting medical evidence regarding his diagnosis, and that he was told by nurse practitioner Kim Najbar on November 13, 2011 that he had stage 3 kidney disease. (Response, Doc. No. 55, p. 3 There is, however, no documentation of this diagnosis in that office visit. Plaintiff accuses Dr. Hakala or another Corizon employee of removing this record from his file to prevent him from using it as evidence in this lawsuit (Surreply, Doc. No. 61, p. 4), but there is no evidence to suggest Defendants deliberately concealed information. Dr. Hakala noted he mistakenly listed CKD 3 as a diagnosis during a 2012 examination of Plaintiff and that based on his GFRs back to 2006, Plaintiff was best described as having chronic renal insufficiency. (SOF, ¶¶ 32-33) Dr. Hakala corrected the face sheet and his physical examination note to reflect this. Moreover, even in cases where doctors diagnose a condition differently, this by itself is insufficient to prove a deliberate indifference claim; doctors are entitled to their medical judgment. White v. Farrier, 849 F.2d 322

11

(8th Cir. 1988).

Second, the record reflects that Plaintiff has received appropriate treatment and monitoring of his CRI. It was Dr. Hakala's medical opinion that in cases of CRI, particularly when the condition is mild and stable, the best course of treatment is to monitor the patient. Indeed, Plaintiff has been undergoing kidney health screening and monitoring on a regular basis at the SECC chronic care clinic since June 2006. During the time period at issue, Dr. Hakala and other SECC physicians have examined Plaintiff and ordered numerous tests to evaluate and monitor his kidney health, including twenty-two (22) blood tests to measure his GFR, two (2) 24 hour urine collections, and two (2) renal ultrasounds. (SOF, ¶ 17, 19, 22, 23, 33, 35, 37) Dr. Babich, a physician at SECC, discussed with Plaintiff his low GFR rate on June 6, 2006 and ordered additional tests. (SOF, ¶¶ 16, 22) Dr. Rayford met with Plaintiff to discuss his CRI diagnosis on January 24, 2012 and May 1, 2012. (SOF, ¶¶ 30, 36) Dr. Rayford explained to Plaintiff that his CRI tests, diagnosis and monitoring date back to 2006. (SOF, ¶ 30)

The fact that Plaintiff has not been referred to a nephrologist does not establish deliberate indifference to his medical needs. Dr. Hakala's medical opinion is that a referral to a nephrologist is not medically indicated for a patient whose CRI is mild and stable. (SOF, ¶¶ 41-44) Instead, Dr. Hakala has determined that a conservative course of treatment and regular monitoring of Plaintiff's kidney function is appropriate. Plaintiff's enrollment in the chronic care clinic allows for continued monitoring of his kidney function and treatment. (SOF, ¶¶ 43-44)

The Court finds this to be a reasonable treatment decision and, even if later found to be wrong, cannot be considered deliberate indifference. Inmates do not have a constitutional right to any particular type of treatment. Johnson v. Singer, 2008 WL 3982066, at *5 (E.D. Mo. Aug. 25,

2008) (citing <u>Long v. Nix</u>, 86 F.3d 761, 765 (8th Cir. 1996)). Moreover, a mere disagreement with the course of treatment or a physician's medical diagnosis fails to state an Eighth Amendment claim of deliberate indifference to serious medical needs. <u>See</u> <u>Peterson v. Correctional Medical Services</u>, 2012 WL 4108908, at *13 (E.D. Mo. Sept. 18, 2012) (citing <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1239 (8th Cir.1997) ("the Court is reminded that 'society does not expect that prisoners will have unqualified access to health care,' and that '[a]s long as th[e] threshold [of deliberate indifference] is not crossed ... prison doctors remain free to exercise their independent medical judgment.' "); <u>see also</u> <u>Vaughn v. Gray</u>, 557 F.3d 904, 909 (8th Cir.2009) (an inmate's Eighth Amendment rights are not violated by defendants' refusal "to implement a prisoner's requested course of treatment") (internal citation omitted). And, likewise, prison physicians do not have to follow the recommendation of an outside consultant; they are free to exercise their independent medical judgment in determining the course of treatment to be followed. <u>See</u> <u>Meuir v. Greene County Jail Employees</u>, 487 F.3d 1115, 1118–19 (8th Cir.2007)

While Plaintiff may dispute the sufficiency of the medical care he received from Dr. Hakala, it is undisputed that he was regularly monitored and treated. And significantly, the record contains no medical evidence verifying that Plaintiff has suffered any long term detrimental effect from an alleged denial of treatment. <u>See</u> <u>Laughlin v. Schriro</u>, 430 F.3d 927, 929 (8th Cir. 2005) (when inmate bases Eighth Amendment claim on treatment delays, he must offer verifying medical evidence establishing detrimental effect of delays); <u>Johnson v. Adams</u>, 452 Fed.Appx. 708 (8th Cir. 2012) (no trialworthy issues on claims against physician where record contained no medical evidence showing plaintiff had suffered long-term adverse effect from the treatment delay). "Federal courts are reluctant to second guess treatment decisions made by competent physicians. Disagreement with a

medical judgment is not sufficient to state a claim for deliberate indifference to medical needs."
Blair v. Brown, 2011 WL 6715888, at *4 (E.D. Mo. Dec. 21, 2011) (quoting Reynolds v. Crawford,
2007 WL 1656269, at *3 (E.D. Mo. June 6, 2007) (internal quotations and citations omitted)). See
also Bell v. Hakala, 2011 WL 2671826 at *5 (E.D.Mo. Jul. 8, 2011) ("Medical care so inappropriate
as to evince intentional maltreatment or a refusal to provide essential care violates the Eighth
Amendment, but a mere disagreement with the course of medical treatment does not constitute a
claim of deliberate indifference.") (citations omitted).

Plaintiff further alleges that, in retaliation for lodging complaints with Missouri legislators
and the Missouri Board of Registration for the Healing Arts, Dr. Hakala has deliberately refused to
refer him for a colonoscopy cancer screening procedure and provide him with corrective surgery for
a hernia protruding from his groin. (AC, ¶¶ 24-38; 44-48; 58)

Plaintiff claims he needs a colonoscopy as soon as possible, because he is a sixty year old
African American with a family history of colon cancer, and has had blood in his stool on several
occasions. He states he had a colonoscopy in 2009, at which time it was recommended that he return
in two years for a second colonoscopy. Plaintiff claims Dr. Hakala told him there was no money for
a two-year follow-up cancer screening, and that he would perform "a digital-rectal examination to
make a determination as to whether an inmate has polyps or cancer in his colon." Plaintiff asserts
that it is medically impossible to finger-examine the entire colon or detect a polyp inside the colon,
and he states that it is medically necessary that he receive a follow-up colonoscopy, as many other
inmates have received. (AC, ¶¶ 51-53)

According to Dr. Hakala, there are three methods to test a patient's colon health: (i) a digital
rectal exam; (ii) a fecal occult blood test; and (iii) a colonoscopy. A digital rectal exam examines the

rectum for lumps or other abnormalities. A fecal occult blood test examines stool samples for blood. A colonoscopy provides an interior image of the large intestine and rectum and is the most invasive of the three methods. (Hakala Aff., ¶¶ 22-25) Plaintiff had a colonoscopy in December 2009, the results of which were normal. Although he refused a digital rectal exam during his yearly physical examinations from 2008 to 2013,[4] Plaintiff submitted three stool samples for a fecal occult blood test in February 2012, all of which were negative for blood. In Dr. Hakala's medical opinion, a colonoscopy was not medically necessary based on Plaintiff's normal colonoscopy in 2009 and three negative fecal occult blood tests in February 2012.

Again, inmates do not have a constitutional right to any particular type of treatment, Johnson, 2008 WL 3982066, at *5, and "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008) (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)).

Plaintiff alleges Dr. Hakala was deliberately indifferent to his medical needs by refusing to order surgery to treat his hernia. (AC, ¶¶ 24-27) Dr. Hakala examined Plaintiff on April 6, 2012 and determined in his medical judgment that surgery was not medically necessary because the hernia was not enlarged or disabling. Specifically, Dr. Hakala was unable to palpitate the hernia from outside the Plaintiff's body when he was standing or lying down. He provided Plaintiff with a truss to prevent protrusion of the hernia and a medical lay-in order, which he renewed in June 2012 and again in August 2012. (SOF, ¶¶ 48-49)

The decision whether to provide additional treatment is a classic example of a matter for

---

[4] On January 8, 2013, Plaintiff commented during a nursing encounter: "They keep refusing my colonoscopy because they said that I refused a DRE [digital rectal exam]. I need to have a DRE done, however I do not want Dr. Hakala to do it." (SOF, ¶ 72)

medical judgment. See, Blair, 2011 WL 6715888, at *4 ("Federal courts are reluctant to second guess treatment decisions made by competent physicians. Disagreement with a medical judgment is not sufficient to state a claim for deliberate indifference to medical needs."). Inmates do not have a constitutional right to any particular type of treatment. Johnson, 2008 WL 3982066, at *5.

As for Plaintiff's allegations in his First Supplemental Complaint that Dr. Hakala discontinued his medications in retaliation for filing the instant lawsuit (Doc. No. 30), the undisputed record refutes his claim. In fact, Dr. Hakala last renewed Plaintiff's prescription for Lovostatin on January 28, 2013. (SOF, ¶¶ 75-78)

Because the record lacks any evidence that Dr. Hakala was deliberately indifferent to Plaintiff's medical needs, the motion for summary judgment will be granted as to Dr. Hakala.

**Robin Fincher**

Fincher is the chronic care nurse assigned to SECC. Plaintiff alleges Fincher knew about, but wantonly concealed, the deterioration of his kidney functions, as well as the onset of CKD. (AC, ¶ 64) It is undisputed that Fincher's involvement with Plaintiff took place at his regularly scheduled chronic care appointments, when she would take his vitals, assess him and review his blood work, medication regime, exercise and diet. (Affidavit of Nurse Robin Fincher (Fincher Aff.), Doc. No. 43, ¶ 5) As a nurse, she was not qualified to diagnose patients. (Id., ¶ 6) There is no evidence that Fincher had a basis for believing Plaintiff was ever diagnosed with CKD, let alone that she concealed such a diagnosis from Plaintiff. As discussed below, Plaintiff has not, and cannot, identify specific Corizon policies mandating the alleged actions of Fincher. Thus, summary judgment will be entered in favor of nurse Fincher.

**Corizon**

"A corporation acting under color of state law may be liable only if policy, custom, or action by those who represent official policy inflicts injury actionable under § 1983." Williams v. Morrison, 2012 WL 3283401, at *6 (E.D. Mo. Aug. 10, 2012) (citing Burke v. N.D. Dep't of Corrections & Rehab., 294 F.3d 1043, 1044 (8th Cir.2002) (per curiam)). See also, Rothman v. Lombardi, 2013 WL 4855301, at *5 (E.D. Mo. Sept. 11, 2013). "The proper test is whether there is a policy, custom or action by those who represent official policy that inflicts actionable injury under § 1983." Walker v. Campbell, 2013 WL 6007623, at *12-13 (E.D. Mo. Nov. 13, 2013) (quoting Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir. 1993)). A plaintiff must (1) "adduc[e] evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct[,]" and (2) "show either that policymakers were deliberately indifferent to the misconduct or that they tacitly authorized it." Jenkins v. County of Hennepin, Minn., 557 F .3d 628, 634 (8th Cir. 2009).

Plaintiff alleges that Corizon "has a written or unwritten policy, custom, practice and/or procedure of refusing to provide expensive medical treatment for chronic and terminal illnesses, and customarily allow[s] inmates to suffer, or die, to save money for [its] owners and stockholders." (AC, ¶ 139; 150) Plaintiff claims Corizon is withholding necessary medical treatment from him, because he had previously lodged complaints with Missouri legislators and the Missouri Board of Registration for the Healing Arts. (AC, ¶¶ 141; 151)

Plaintiff's allegations of deliberate indifference are based on the treatment that was or was not provided by individual actors. Dr. Hakala attested in his affidavit that his treatment decisions are based upon his independent medical opinion and are made on a case-by-case basis. Plaintiff has provided no evidence of specific Corizon policies that mandated the decisions or actions of Dr. Hakala or Nurse Fincher. He argues the Court denied his motion to compel production of Corizon's

17

written policy setting forth the conditions or medical circumstances under which MDOC chronic care inmates are entitled to treatment for CKD, and that if the Court had appointed him counsel, he would have had access to the policy. In response to Plaintiff's motion to compel, Corizon stated that medical decisions are within the discretion of the treating physician who uses his or her training, experience and professional judgment to provide care to each individual patient based on that patient's specific medical needs. The Court inferred from this response that Corizon did not in fact have any written policy dictating treatment decisions of inmates and denied the motion to compel. This ruling would have been the same regardless of whether Plaintiff had been represented by counsel. Moreover, the undisputed evidence of Plaintiff's comprehensive treatment directly contradicts the existence of the alleged policy. Therefore, Corizon is entitled to summary judgment in its favor.

## V. **Conclusion**

Plaintiff has failed to present sufficient evidence to "'clear [the] substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded [his] needs by administering an inadequate treatment.'" Peterson, 2010 WL 4108908, at 16 (E.D. Mo. Sept. 19, 2012) (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)). The care Plaintiff received for his chronic renal insufficiency was consistent with the care and treatment provided to someone whose condition is mild and stable. The treatment decisions made regarding Plaintiff's hernia and his requests for a colonoscopy were reasonable based on independent medical opinion. For these reasons, the motion for summary judgment will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [38] is **GRANTED**.

An appropriate Judgment will accompany this Memorandum and Order.

Dated this 18th day of February, 2014.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**